**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**LINDA JENICE BROWN, Personal**
**Representative of the Estate of**
**TIMOTHY ANTOINE CURRY, Deceased,**

                **Plaintiff(s),**         **CASE NUMBER: 04-70438**
                                     **HONORABLE VICTORIA A. ROBERTS**

**v.**

**THE TOWNSHIP OF CLINTON, et al.,**

                **Defendant(s).**
_____/

**ORDER**

**I.    INTRODUCTION**

      This matter is before the Court on Defendants' Motion for Summary Judgment.

The Court **GRANTS IT IN PART AND DENIES IT IN PART**.

**II.    BACKGROUND**

      Plaintiff Linda Jenice Brown brings this action as the Personal Representative of

the estate of Timothy Antoine Curry, who is deceased.[1]  Defendants are: the Township

of Clinton; the Chief of Police for the Clinton Township Police Department ("CTPD"), Al

Ernst; CTPD Captain Gary Franey; CTPD Lieutenants Waldoch and Rybinski; CTPD

Sergeant Terzo; and, CTPD Officers Glen Bowles, Norman Graleski, Mark Krutell, Curt

Randall, Dave Vandenheede, Glenn Burgess, Friese, Terry, and Penick.[2]

_____

[1]Plaintiff is the decedent's aunt.

[2]For several of the Defendants, only the last name is given.

1

On February 19, 2001, Timothy Curry was shot multiple times and killed when CTPD officers responded to a call to a residence.  Plaintiff alleges that the officers used excessive force against Mr. Curry.  She further alleges that supervisory officials in the CTPD ratified the officers' use of illegal force and collectively declined to properly investigate the matter, in accordance with an unconstitutional policy or custom of the Township of Clinton.

Many of the facts that precede the shooting death of Timothy Curry are undisputed.  On February 19, 2001, Zephonia Baker called 911 and complained that Curry refused to leave her home.  Curry was Mrs. Baker's first cousin.  He had been staying with Mrs. Baker and her husband, Jeffrey Baker, for a few days.  However, she reported that he was behaving and talking strangely and refused to leave her home when asked.  Curry had recently been baptized, and told Mrs. Baker that he was afraid that he was going to Hell because he drank a beer.  He also called several relatives to tell them that he loved them, which apparently was an uncharacteristic gesture.

Officers Burgess, Bowles and Vandenheede arrived to find Mr. Curry in the basement.  Vandenheede says that Mrs. Baker advised that there were no guns in the basement, but that she did not know whether Curry had a gun.  Burgess says that Mr. Baker also advised that there were no guns or other weapons in the basement, but that there might be kitchen utensils.  Standing in the kitchen at the top of the basement steps, Officer Bowles observed Curry at the bottom of the steps, in the dark, with his left hand in his jacket pocket.  Officer Bowles asked Curry to take his hand out of his pocket and encouraged him to come upstairs to talk.  Curry did not respond verbally or remove his hand from his pocket.  But, he came part way up the steps and stopped.  He then

2

made a lunging motion towards Bowles and stopped.  Bowles continued to talk to Curry, but Curry eventually retreated further into the basement out of Bowles' view.  Bowles asked Burgess to call for an additional squad car.  Bowles and Vandenheede continued to talk to Curry with no response.

Officers Bowles and Vandenheede went down the basement steps.  Curry was near the steps with his hand still in his pocket.  At the bottom of the steps, Curry again made a lunging motion towards Bowles two or three times.  Bowles responded by using pepper spray on Curry, who retreated further into an area of the basement that was out of Bowles' sight.  Curry did not appear to be affected by the pepper spray.  The officers went back upstairs at which time Mr. Baker says that he told the officers that Curry may have been trying to get them to kill him.  Bowles asked Burgess to request that Officer Krutell come with his canine unit.  In the meantime, Bowles continued to try to convince Curry to come upstairs and Officers Randall, Graleski and Richard Vauris arrived.  Shortly thereafter, Curry came up the stairs and stepped into the kitchen.

The accounts given by the officers in their reports about what happened next do not vary significantly.  They say that Curry still had his hand in his pocket, did not speak, and simply stood in the kitchen with a blank stare.  Several officers continued to try to talk to Curry.  Vandenheede says he offered Curry a chair; Curry did not accept.  Officer Randall left the room to open the front door because of the pepper spray fumes.  As Randall reached the door, Officer Krutell approached with his canine and Randall let them inside.  As Krutell and Randall proceeded back to the kitchen, the situation in the kitchen erupted.

Officer Vauris suddenly rushed at Curry, grabbed him in a bear hug, and pushed

3

him toward the wall.  The officers say that they do not know what prompted Vauris'

actions.  But, the officers say Curry began to struggle with Vauris and a number of

officers joined Vauris in trying to subdue Curry.  During the struggle, Bowles and

Burgess say that they saw Curry grab Vauris' gun, which was in Vauris' holster.  Bowles

says that he grabbed Curry's hand and yelled out that Curry had his hand on the gun.

Bowles says the gun came out of the holster as several officers and Curry fell to the

ground.  It is not clear which officers fell to the floor with Curry at that moment.  But it

appears from the officers' reports that all of them, except Krutell, joined the struggle and

ended up on the floor very shortly after it began.

Randall joined the struggle when he walked in and saw all of the officers on the

ground with Curry.  Curry's precise positioning after he fell to the floor is not clear.

Burgess, Randall and Bowles all assert that Curry was face down.  However, Randall

says that Curry was on his stomach and Bowles testified that Curry was face down but

on his knees.  In the statement Officer Krutell gave during the CTPD investigation, he

said that he only saw Curry on his back or side.

Bowles says that Curry had the gun in his right hand.  So, Bowles held Curry's

wrist and attempted to grab the gun.  But, Bowles says Curry pulled the gun underneath

his (Curry's) body.  Bowles then yelled, "He has a gun," two or three times.  Seemingly

simultaneously, each officer claims to have reacted to Bowles' proclamation by either

attempting to disarm Curry or by taking defensive measures.  Vandenheede says that

he could not see the gun, but tried to grab Curry's arms, which were underneath Curry.

Graleski says that he dropped the baton that he held, and with one hand pushed on

Curry's back to push him to the ground and unholstered his weapon with the other

4

hand.  Burgess says that he continued to push down on Curry's back and started to draw his weapon.  Randall said that he began to apply "muscling" techniques and punches.

Bowles said that Vauris, who was on Curry's right side, pulled on Curry's right arm.  Bowles then saw the gun reappear from under Curry and says he saw Curry pull the trigger with his "little" finger.  Each officer heard a gunshot.  Randall says that he then saw the gun in Curry's hand and saw Vauris fall to the side.  Graleski and Burgess saw Vauris go limp, and Vandenheede heard Vauris yell "I'm hit, I'm shot."  Krutell said that he saw the gun on Curry's chest, while Curry was on his back or side.

Bowles and Vandenheede say they continued to struggle with Curry, during which Bowles says Curry pulled the gun back under him (Curry) while Bowles pulled on his wrist.  Because they say that they feared for their safety and the safety of others, Randall, Graleski and Burgess disengaged themselves from the struggle and fired multiple shots at Curry.  When the shots began, Bowles says he let go of Curry's wrist. Vandenheede says that he let go of Curry, lunged back and took cover.   After the gunfire ceased, Vandenheede says Curry was face down clenching the gun in his right hand with his index finger still on the trigger.  Curry was shot fourteen times and died from multiple gunshot wounds.  Officer Vauris, who was shot once in the chest, also died.

Plaintiff contends that the physical evidence and eyewitness testimony do not bear out the officers' claim of what occurred.  Jeffrey Baker was standing in the kitchen doorway (adjacent to the living room) when Curry came up the basement stairs and into the kitchen.  Contrary to the officers' claim that Curry remained standing prior to the

5

melee, Mr. Baker says that Curry sat down as instructed.  Without provocation from Curry, Mr. Baker says that one of the officers, whom he could not identify, lunged towards Curry and took him from the chair to the ground.  When he was taken to the ground, Mr. Baker says that Curry's arms were behind his back and he did not resist; he was limp.  Before Curry fell to the ground, Mr. Baker says that he did not see a gun in Curry's hands or Curry struggling over a gun.  After Curry was taken to the ground, Mr. Baker says that the other officers piled on top of Curry, who was face down.  Mr. Baker then heard one shot after which an officer said "Oh shit."  Shortly thereafter, another officer said "He has the gun," and then there was a sequence of shots.  Because of the officers piled on top of Curry, Mr. Baker says that he could not see the weapon or Curry when the first shot went off.

Mr. Baker met Vauris on a prior occasion and he says that, contrary to the officers' claim, Vauris was not the officer who grabbed Curry and took him to the ground.  Mrs. Baker was also in the doorway just before and during the shooting. Contrary to Vandenheede's claim that Curry was still clenching the gun after the shooting ceased, Mrs. Baker says that she did not see a gun in Curry's hand after he was shot.

The Firearms Investigative Team ("FIT") conducted an administrative investigation of the incident to determine whether the use of force was justified under CTPD department policy.  The Macomb County Prosecutor's Office conducted an independent criminal investigation.  The FIT team consisted of Weapons Training Coordinator Sergeant Raymund Macksoud, Assistant Weapons Training Coordinator Officer Leonard Hrecho, and Captain Thomas White, the Chief of Police designee.

6

The FIT team indicated in a one sentence report dated March 12, 2001 that it found that the use of force by Defendants Burgess, Graleski and Randall was justified. The Prosecutor's Office made the same finding.  In its report, the FIT team indicated that it reviewed the incident report and interviewed the officers involved.  Captain White testified that the team also considered a 911 tape, photographs and sketches of the scene, and the written witness statements.  He says that the team's investigation closed on March 12, 2001, and that the team did not wait for all of the forensic testing results because they regarded the forensic evidence as irrelevant in light of the officers' claim that Curry had a gun in his hand and they believed there was imminent danger.  Pl. Exh. 20, White Dep. at pp. 30, 32-33, 71-72.  Defendant Captain Ernst, who assigned the investigation to the FIT team, says that he accepted its recommendation after discussing the findings with the team members.

Plaintiff bases her claim against the supervisory Defendants on the FIT team's failure to consider certain evidence and Captain Ernst's acceptance of the team's findings despite what Plaintiff regards as apparent inconsistencies and a less than thorough investigation.  Plaintiff contends that the supervisory Defendants' actions (or lack thereof) amount to ratification of what Plaintiff says was an illegal use of deadly force.  Plaintiff lists the specific evidence she feels was wrongfully ignored.

First, contrary to the officers' report that one shot was fired by Curry from Vauris' gun, Michigan State Police Captain Michael Thomas indicated that two bullets were actually fired.  Captain Thomas released these findings sometime after the FIT team concluded its investigation.  The officers are unable to account for the second shot. Another piece of evidence Plaintiff says was ignored is Curry's autopsy report, which

7

was released before the FIT team completed its investigation.  The autopsy report indicates that one of the fourteen shots fired into Curry was at close range in the side of his right lower chest.  The autopsy shows that the muzzle of the gun made contact with Curry's body and left an imprint.  The officers are also unable to account for this shot. Bowles merely speculates that Curry shot himself during their struggle for the gun, which would explain the second shot from Vauris' weapon and Curry's close range wound.[3]

Second, Plaintiff argues that some physical evidence is inconsistent with the officers' story, and other evidence that should have been tested was not.   For instance, State Police Specialist Sergeant Karen Dutcher indicated in her report that a latent print was removed from Vauris' gun.  Dutcher found that the print did not belong to Curry, but none of the officers' fingerprints was submitted for comparison so that it could be identified.

Also, Curry and Vauris' clothing and the bullets removed from their bodies were sent to the Michigan State Police for testing to determine the distance from which the shots were fired and from which guns the bullets came.  However, Captain Thomas testified that the examinations were discontinued on approximately April 23, 2001, after he was advised that the prosecutor's office deemed the shooting to be a justifiable homicide.  Pl. Exh. 8, Thomas Dep. at pp. 33-35.  Notably, Captain White testified that the FIT team could have delayed in making its recommendation and requested that

---

[3]Plaintiff asserts that Krutell said that, based on what he saw, Bowles could have shot Vauris.  This is incorrect.  Krutell said that Bowles and Curry were fighting over the gun just before the first shot was fired.  When asked whether it could have been Bowles that fired the gun, Krutell said "I don't know." Pl. Exh. 4b, Krutell Dep. at p. 25.

testing continue for purposes of its investigation. Pl. Exh. 20 at p. 55.

Third, Plaintiff points out what she regards as inconsistencies at the scene. Plaintiff says that there is an unexplained bullet hole in the kick panel of the kitchen cabinet.  Per Plaintiff, although the kitchen cabinet hangs out over the kick panel by four inches, the bullet hole is three inches from the floor and entered straight without any angle.  Plaintiff, therefore, contends that this bullet could not have been fired by one of the officers.  Rather, she says that the bullet hole is inches from Plaintiff's hand as shown in post-mortem photographs.  Notably, however, Plaintiff does not present any evidence to support any aspect of her assertion.  There is no evidence confirming: the trajectory of the bullet; that the bullet could not have been fired by one of the officers; or, that the hole in the kick panel is in fact a bullet hole that was created by the gunfire on the date of the incident.

Next, Plaintiff points out that crime scene photographs show a chair at the kitchen table toppled over.  *See* Pl. Exh. 13.  Plaintiff asserts that this is inconsistent with the officers' claim that the struggle occurred in front of the stove across from the kitchen counter.  And, finally, Plaintiff says the supervisory Defendants ignored the fact that Vauris had "questionable" substances in his system on the date of the incident. The toxicology report shows that he had ephedrine and an unspecified amount of amphetamines in his system.

In her First Amended Complaint, Plaintiff alleges three federal claims:  Count I-- violation of 42 U.S.C. §1983; Count II--"violation of 42 U.S.C. §1983 conspiracy to violate the rights of Tim Antoine Curry;" and, Count III--"supervisory liability 42 U.S.C. §1983."  Plaintiff also alleged two state claims against the Defendant officers: assault

9

and battery (Count IV), and gross negligence (Count V).  However, Count IV was dismissed by stipulation on April 12, 2004.  Defendants move for summary judgment on Counts I, II and V.  They did not make any argument with respect to Count III.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).  The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*,

10

48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.   APPLICABLE LAW AND ANALYSIS

### A.   DEFENDANT OFFICERS

#### i.   Clarification of Claims Asserted

It is necessary to preliminarily clarify the claims at issue, because Plaintiff's federal claims against the Defendant officers are not clearly articulated in either her brief or her First Amended Complaint. In Count II of her complaint, Plaintiff alleges a §1983 civil conspiracy by the officers (and other Defendants) and alleges that they conspired by, *inter alia*, assisting in the shooting, allowing and failing to prevent the shooting, failing to restrain or arrest certain Defendants for their unlawful shooting, and failing to accurately report the circumstances of the shooting. *See* First Amended Complaint at ¶47.

11

In her brief, however, Plaintiff simply argues that the officers violated §1983, by their use of excessive force (Count I).  And, while Count II alleges conspiracy by the officers and Ernst, the brief only argues that Chief Ernst conspired with the unnamed Captain White.  The brief does not argue conspiracy by the officers.

The Court can only presume that the claim argued by Plaintiff against the Defendant officers in her brief is based on the allegations in paragraph 43 of Count I that "[D]efendants" deprived Curry of his Fifth and Fourteenth Amendment rights without due process, subjected him to unreasonable searches and seizures in violation of the Fourth Amendment, and deprived him of equal protection in violation of the Fourteenth Amendment.  The paragraphs preceding paragraph 43, however, appear to be directed solely at the Township of Clinton (and, as discussed more fully below, the supervisory Defendants).

From the arguments made by the Defendant officers in favor of summary judgment, they presumed Plaintiff asserts a violation of §1983 on multiple constitutional grounds against them.

Therefore, in light of the Defendant officers' apparent understanding that Plaintiff's claim in Count I was made against them, coupled with the arguments in Plaintiff's brief, the Court presumes that Plaintiff abandoned her claim of §1983 conspiracy by the Defendant officers (Count II), and is only asserting under Count I, that they violated §1983 on several constitutional grounds.

There is additional confusion in Plaintiff's brief, however, with regard to her §1983 claim.  She asserts that Defendants Randall, Graleski, Burgess, Bowles and Vandenheede are liable under 42 U.S.C. §1983 for their "deliberate indifference" to Mr.

12

Curry by their unlawful exercise of force and deadly force in violation of the Fourth

Amendment.  Pl. br. at p. 6. She further says that the officers' "act in shooting to death

Tim Curry deprived Curry of his constitutional right to be free from unreasonable

seizure." *Id.*  The confusion stems from Plaintiff's use of the terms "unreasonable

seizure" and "deliberate indifference," which are recognized causes of action under the

Fourth and Eighth Amendments, respectively.  However, it appears from the allegations

and arguments made that Plaintiff is actually only asserting a claim of excessive force in

violation of the Fourth Amendment.  Furthermore, Plaintiff did not respond to

Defendants' motion for summary judgment on her claim that Curry was deprived of due

process in violation of the Fifth and Fourteenth Amendments.

Based on the arguments made in (and omitted from) Plaintiff's brief, the Court

presumes that Plaintiff abandoned her §1983 due process claim under the Fifth and

Fourteenth Amendments, and that she is only asserting a claim of excessive force

under the Fourth Amendment.  Also, even though Defendants did not move for

summary judgment on Plaintiff's claim in Count I that Curry was deprived of equal

protection in violation of the Fourteenth Amendment, the Court *sua sponte* dismisses

this claim because there are no allegations in the complaint or Plaintiff's brief which

support it.  To state a §1983 claim under the Equal Protection Clause, Plaintiff must

allege that "a state actor intentionally discriminated against the plaintiff because of

membership in a protected class."  *Henry v Metropolitan Sewer District*, 922 F.2d 332,

341 (6th Cir. 1990).  No such allegations are made in this case.

In its analysis, then, the Court presumes that Plaintiff is asserting a §1983,

excessive force Forth Amendment claim against the officers.

13

ii.    42 U.S.C. §1983

"To state a cause of action under §1983, a plaintiff must allege the deprivation of

a right secured by the United States Constitution or a federal statute by a person who

was acting under color of state law."[4]  *Spadafore v Gardner*, 330 F.3d 849, 852 (6th Cir.

2003).  Injuries caused by mere negligence do not constitute a "deprivation" of a

constitutionally protected right.  *Ahlers v Schebil,* 994 F. Supp 856, 864 (E.D. Mich.

1998), *aff'd,* 188 F.3d 365 (6th Cir. 1999)(quoting *Lewellen v The Metropolitan*

*Government of Nashville*, 34 F.3d 345, 348-349 (6th Cir. 1994), *cert. den.,* 513 U.S.

1112 (1995)).  It is undisputed that Defendants were acting under color of law.

However, Defendants deny that there was a constitutional violation, and they contend

that they are entitled to qualified immunity in any event.  The Court will first consider

whether Plaintiff established a constitutional violation.

As a preliminary matter, although Officers Krutell and Terry are named

Defendants, Plaintiff does not list them in her brief among the officers whom she

contends are liable for excessive force.  No other allegations are specifically made

against either officer.  Plaintiff has failed to support that these officers violated Curry's

constitutional rights.  Therefore, Defendants' motion is granted with respect to Officers

---

[4]42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State . . . subjects, or causes to be
subjected, any citizen . . . the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be liable to
the party injured in an action at law, suit in equity, or other proper
proceeding for redress.

14

Krutell and Terry.

With respect to Defendants Bowles and Vandenheede, neither officer fired any shots and Plaintiff does not clearly indicate the basis of her claims against them. However, considering the allegations in Plaintiff's complaint and Plaintiff's allegation in her brief that all of the officers against whom the claim is brought are liable for "shooting to death" Mr. Curry, the Court can presume that Plaintiff alleges that Defendants Bowles and Vandenheede are liable for assisting in the shooting and/or failing to prevent the shooting or restrain the shooting officers. *See* Amended Complaint at ¶47. But, there is no evidence which creates a genuine issue of material fact on this claim.

In order to find an officer liable for excessive force, a plaintiff must prove that the officer: 1) actively participated in the use of excessive force; 2) supervised the officer who used excessive force; or 3) owed the victim a duty to protect against the use of excessive force. *Turner v Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The alleged excessive force was the shooting death of Mr. Curry. Consequently, Plaintiff cannot even *prima facie* establish excessive force by Officers Bowles or Vandenheede by the first or second means; there is no evidence that either officer shot Plaintiff or that either officer was acting in a supervisory capacity over the other officers.

Plaintiff attempts to create an issue of fact by claiming that Krutell said that Bowles could have shot Plaintiff while struggling over the gun. As stated in footnote 3, *supra*, however, this is a mischaracterization of Krutell's testimony. He actually said that he did not know whether Bowles could have fired the shot.

In order to establish excessive force by the third means--failure to protect a person from excessive use of force--a plaintiff must show that: 1) the officer observed or

15

had reason to know that excessive force would be or was being used, and 2) the officer had both the opportunity and the means to prevent the harm from occurring. *Id.* Plaintiff cannot meet her burden with respect to Officers Bowles and Vandenheede by this means, because there is no evidence that either was in a position to intervene to prevent Officers Randall, Burgess or Graleski from firing their weapons. It is apparent that the sequence of events which led to the shooting occurred in rapid succession. There is no evidence that Bowles or Vandenheede had an opportunity to anticipate or stop the other officers from firing. Consequently, Plaintiff has not demonstrated a constitutional violation by these Defendants either. Defendants Bowles and Vandenheede's motion for summary judgment is granted.

Although it is a close question, there is a question of fact with regard to whether Defendants Randall, Burgess and Graleski violated Curry's constitutional rights. The critical question is whether Mr. Curry grabbed and fired Officer Vauris' weapon, because it is these alleged acts that the officers rely upon to justify their use of deadly force.

Claims of excessive force by police officers must be analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v Connor,* 490 U.S. 386, 395 (1989). When analyzing such a claim the Court must consider: 1) the severity of the crime; 2) whether the suspect poses an immediate threat to the safety of officers or others; and 3) whether the suspect is actively resisting arrest or attempting to flee. *Id.* The trial court must determine "whether the officers' alleged actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id* at 397. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

16

hindsight." *Id* at 396.

Defendants contend that they are entitled to qualified immunity and summary judgment because neither the Bakers' testimony nor any other evidence directly refutes the officers' claim that Curry grabbed and fired Vauris' weapon at some point during the melee. However, the Court must construe all reasonable inferences in Plaintiff's favor.

There is other evidence which conflicts with the officers' claim. First, there is evidence which suggests that Curry never had his hand on the weapon. Mr. Curry's fingerprint was not found on the weapon, and Mrs. Baker testified that, contrary to Vandenheede's claim, she did not see a weapon in Curry's hand after the shooting ended.

Second, there is no forensic or other evidence that conclusively establishes that Vauris was shot by Curry. There is evidence which suggests otherwise when it is considered with the totality of the evidence. Specifically, Mr. Baker testified that he did not see Curry resist or appear to struggle with the officers. When Curry was taken to the ground, Mr. Baker said Curry's hands were behind his back and that he was limp. Mr. Baker also testified that Vauris was not the officer who grabbed Curry initially; nor did Baker see any indication that Vauris was hit after the first shot was fired. Because the officers' version of events all stem from Curry's initial contact with Vauris and his alleged struggle over Vauris' gun, Mr. Baker's assertions, if believed, conflict with the officers' account of what happened.

These factual conflicts could be resolved by the trier of fact to find that Curry never had his hand on Vauris' gun or fired it, which would defeat the only justification asserted by the shooting officers for their use of deadly force. Therefore, there is a

17

question of fact regarding whether Mr. Curry's Fourth Amendment rights were violated.

Consequently, the Court cannot reach the question of qualified immunity.  *See*

*Gardenhire v Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).  Defendants Randal, Burgess

and Graleski's motion for summary judgment is denied.

### iii.    Gross Negligence

In Count V, Plaintiff alleges a state law claim of gross negligence against the

Defendant officers.  Under Michigan statutory law, a governmental employee acting

within the scope of his authority is entitled to governmental immunity from tort liability

unless the plaintiff can establish that the employee's actions amounted to gross

negligence:

> [E]ach officer and employee of a governmental agency . . . is
> immune from tort liability for an injury to a person or damage to
> property caused by the officer, employee, or member while in the
> course of employment or service or caused by the volunteer while
> acting on behalf of a governmental agency if all of the following are
> met:
>
> (a) The officer, employee, member, or volunteer is acting or
> reasonably believes he or she is acting within the scope of his or her
> authority.
>
> (b) The governmental agency is engaged in the exercise or
> discharge of a governmental function.
>
> **(c) The . . . employee's . . . conduct does not amount to gross
> negligence that is the proximate cause of the injury or damage.
> As used in this subdivision, "gross negligence" means conduct
> so reckless as to demonstrate a substantial lack of concern for
> whether an injury results.**

M.C.L. §691.1407(2)(emphasis added).  To sustain a claim, a plaintiff must allege

substantially more than ordinary negligence.  *Maiden v Rozwood,* 461 Mich. 109, 122

18

(1999). And, the requirement that the employee's actions be "the proximate cause" has been interpreted to mean "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v City of Detroit,* 462 Mich. 439, 459 (2000).

For the reasons stated with regard to Plaintiff's §1983 claim, the Court finds that Plaintiff has not presented any evidence against Defendants Krutell, Terry, Bowles or Vandenheede upon which the trier of fact could find that they behaved in a manner that was "so reckless as to demonstrate a substantial lack of concern for whether an injury [would result]." Plaintiff has raised a question of fact with regard to Defendants Randall, Burgess and Graleski. Whether Randall, Burgess and Graleski's actions were reckless within the meaning of the statute depends upon whether the trier of fact finds that Curry had his hand on a weapon and/or fired a weapon as Defendants claim. Defendants Krutell, Terry, Bowles and Vandenheede's motion for summary judgment is granted. Defendants Randall, Burgess and Graleski's motion is denied.

### B.      SUPERVISORY DEFENDANTS

#### i.      Failure to Investigate

Plaintiff does not clearly indicate which Count of her complaint the failure to investigate claim is brought under. However, allegations consistent with the arguments made by Plaintiff in her brief are only asserted in subparagraphs 6 through 11 of paragraph 40 in Count I, although paragraph 40 is purportedly only brought against the Township of Clinton. Therefore, the Court presumes that the failure to investigate claim is asserted under Count I only.

In her brief, Plaintiff argues that Defendant Ernst, who is the Chief of Police, and

19

the remaining supervisory Defendants--Franey, Waldoch, Terzo, Rybinski, Friese and

Penick--ratified the Defendant officers' alleged illegal use of force by failing to conduct a

meaningful investigation of the shooting.  Again, Plaintiff's claim against certain of the

supervisory Defendants is not well articulated.  Plaintiff clearly argues that Ernst is liable

because he failed to conduct an adequate investigation and simply accepted the FIT

team's recommendation despite evidence that Plaintiff says contradicts the officers'

justification for the shooting.  However, she only makes very general allegations against

the remaining supervisory Defendants:

> Chief Al Ernst and the other supervising defendants, who were at the
> scene following the shooting, were deliberately indifferent to a
> determination of the truth.  Each took the word of the shooting
> officers ignoring the physical evidence which earmarked the
> inconsistencies which became known to them.  Each testified they
> relied only on what the defendants claimed to justify the shooting
> death of Tim Curry and never looked back.

Pl. br. at p. 13.

These general allegations are insufficient to raise a question of fact against

Defendants Franey, Waldoch, Terzo, Rybinski, Friese and Penick.  The FIT team

conducted the formal investigation of the shooting on Defendant Ernst's orders.  Franey,

Waldoch, Terzo, Rybinski, Friese and Penick were not on the FIT team, and Plaintiff

has not presented any evidence articulating their respective roles in the investigation.

Consequently, there is no evidence to support Plaintiff's claim against Defendants

Franey, Waldoch, Terzo, Rybinski, Friese and Penick.  Their motion for summary

judgment is granted.

Turning to Plaintiff's claim against Defendant Ernst, failure to investigate may

give rise to supervisory liability under §1983.  *Marchese v Lucas*, 758 F.2d 181, 188 (6th

20

Cir. 1985).  In *Marchese*, the Court upheld the trial court's denial of the defendant's

motions for directed verdict and judgment notwithstanding the verdict.  Plaintiff brought

a §1983 action against the Wayne County Sheriff and the County of Wayne.  Plaintiff

alleged, among other things, that he was beaten when he was brought into the jail and

later in his cell by someone who had a key.  The beating allegedly was prompted by the

fact that plaintiff pointed a weapon at a sheriff's deputy during his arrest.  Plaintiff's

injuries following the assault in his cell were visible and prompted a district court judge

to order an investigation.

According to the *Marchese* Court, there was evidence that the shift officers on

duty knew when the late night assault in plaintiff's cell was going to take place, heard it

in progress and attempted to cover it up afterwards.  However, "no serious

investigation" was done to identify the perpetrators and no penalties were levied.

*Marchese*, 758 F.3d at 188.  The Court said that "[t]he Sheriff's subsequent failure to

order and direct an investigation which disclosed exactly who were the perpetrators of

these brutal violations to the U.S. Constitution and to administer censure and

punishment served to confirm the existence of an unstated 'policy' of toleration of illegal

brutality toward any county prisoner who had threatened the life of a sheriff's deputy."

*Id* at 184.  The Court said that it regarded this policy as ratification of the illegal acts of

the unidentified officers that the jury found to have inflicted injuries upon the plaintiff.  *Id*

at 188.  Moreover, even though the Sheriff was not present when the assaults occurred

and claimed that he did not know about them until after the suit was filed, the *Marchese*

Court held that he was liable in his official capacity because he "had a duty to both know

and act."  *Id*.

21

*Marchese* is factually and procedurally distinguishable from the instant case, but its principle--that officials charged with responsibility to investigate the constitutional propriety of the actions of law enforcement officers must conduct a meaningful investigation--has been applied under analogous circumstances. *See Walker v Norris,* 917 F.2d 1449 (6th Cir. 1990)(supervisors of prison guards allegedly did not take remedial or disciplinary action against guards who failed to prevent inmate stabbing); *Leach v Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989)(sheriff took no remedial or disciplinary action against subordinates who acted with deliberate indifference to the medical needs of an inmate). Although the question is a close one, the Court finds that there is evidence which suggests that Defendant Ernst failed to conduct a meaningful investigation. First, Captain White testified that the FIT team investigation of the shooting was essentially limited to written statements by the officers and witnesses, and interviews with the officers.

Second, the FIT team did not consider forensic information that was available prior to the FIT team's final decision, which was inconsistent with the officers' statements and arguably warranted further investigation. Specifically: 1) Karen Dutcher determined that Curry's fingerprint was not on the weapon; 2) the autopsy revealed that a close range shot was fired at Curry; and 3) medical reports indicated that Officer Vauris had amphetamines in his system. The fact that Curry's print was not on the weapon and that he appeared to have been shot at close range, are both inconsistent with the version of facts given by the officers at the scene.

Finally, the FIT team declined to await the results of pending forensic testing by the Michigan State crime lab or request specific testing of certain evidence. For

22

instance, the FIT team did not order testing of the bullet retrieved from Vauris' body to confirm that the bullet came from his weapon.  It did not attempt to identify the print found on Vauris weapon.  Instead, Captain White testified that the team based its conclusion solely on what it regarded as the officers' credible account of what occurred.  Pl. Exh. 20 at pp. 31, 35, 47-48, 59-60.  Presuming the truth of the officers' statements, he says the team felt that the forensic evidence could not affect its decision.

When the FIT team's acts and omissions are considered in the context of all of the facts in this case and reasonable inferences are construed in Plaintiff's favor, a question of fact exists as to whether Captain Ernst's acceptance of the FIT team's limited investigative efforts satisfied his obligation to conduct a meaningful investigation.  Therefore, Defendants' motion for summary judgment on Plaintiff's claim for failure to investigate in Count I against Defendant Ernst is denied.

### ii.    Conspiracy

In Count II of her complaint, Plaintiff alleges civil conspiracy under §1983 against all of the Defendants.  *See* First Amended Complaint at ¶¶45-48.  However, in her brief she only alleges this claim against Defendant Ernst.  Therefore, the Court presumes that Plaintiff abandoned this claim against all of the Defendants except Defendant Ernst.

The Sixth Circuit defines a civil conspiracy as "an agreement between two or more persons to injure another by unlawful action."  *Spadafore*, 330 F.3d at 854 (*quoting Hooks v Hooks,* 771 F.2d 935, 943-944 (6th Cir. 1985)).  It is not necessary that there be an express agreement among the conspirators and each conspirator does not need to have known all of the details of the plan or all of the participants.  *Id*.  Rather, "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator

23

shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.*[5]  Such claims must be alleged with specificity and can be proven with circumstantial evidence.  *Id.*

Plaintiff argues that Defendant Ernst conspired with Captain White (who is not a named Defendant) to perform only a cursory investigation of Curry's shooting death. She says that they chose not to make inquiry about disputed facts or to consider any evidence that became known after the FIT team investigation closed.

Plaintiff's claim fails because there is no evidence showing a single plan between Defendant Ernst and Captain White.  Defendant Ernst appointed Captain White as one of three members of the FIT team to investigate the shooting.  There is no evidence that Defendant Ernst was in any way involved in the conduct of the investigation by the FIT team or Captain White.  Defendant Ernst's after-the-fact acceptance of the FIT team's investigative efforts as adequate is not direct or circumstantial evidence that he and Captain White agreed not to fully investigate the shooting.  The fact that neither Defendant Ernst nor Captain White exercised their authority to reopen the investigation after other evidence became known to them also does not suggest a preconceived plan. Plaintiff failed to demonstrate that there is a question of fact.  Defendants' motion for summary judgment on Count II is granted.

---

[5]Plaintiff erroneously relies upon the standard set forth by the Ninth Circuit in *Ting v United States*, 927 F.2d 1504, 1512 (9th Cir. 1991), for a *Bivens* conspiracy claim. Under *Bivens v Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), private citizens can recover damages for injuries suffered as a result of a federal official's violation of the Constitution.  Plaintiff does not cite any authority showing that *Bivens* and §1983 conspiracy claims should be analyzed under the same standard or that the Sixth Circuit has adopted the standard set forth in *Ting.*

24

**C.    DEFENDANT TOWNSHIP OF CLINTON**

Plaintiff alleges in Count I that the Township of Clinton is liable under §1983 because it authorized and tolerated the excessive use of force as an "institutional practice." First Amended Complaint at ¶40. Plaintiff apparently relies solely upon the Defendant Ernst's alleged "failure to respond to the use of great force under very questionable circumstances" as evidence of the claimed institutional practice. Pl. br. at p. 19.

"To prevail in a §1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)(*citing Monell v Dep't of Social Services*, 436 U.S. 658, 694 (1978)). A municipality cannot be held vicariously liable under §1983 on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. Rather, a plaintiff must show that he was injured by "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.*

In this case, Plaintiff essentially alleges that the Township of Clinton had a custom of tolerating excessive force by its officers, which she contends is evidenced by Defendant Ernst's failure to take appropriate measures to address what she describes as the questionable circumstances surrounding Curry's death. The Sixth Circuit in *Thomas v City of Chattanooga, supra*, considered and rejected a similar claim.

In *Thomas*, an officer responded to a call by plaintiffs' neighbor that there was domestic disorder at plaintiffs' home. The neighbor reported that plaintiffs--husband and wife--were screaming at each other. The officer approached plaintiffs' home, heard

25

screaming and looked into the kitchen through a door window.  He saw plaintiffs, but could not hear what they were saying.  He saw two rifles on a countertop and a handgun in each of the husband's hands.  The officer's view of the gun in the husband's left hand was partially obstructed at one point, but he believed that the husband pointed it at the wife following an exchange.  Based on the wife's expression and backwards movement, the officer believed that she was in imminent danger.  So, he fired seven shots at the husband's left arm through the door window, injuring the husband.  The plaintiffs later said that they were only putting the guns away and that the husband had started to walk away from his wife just before he was shot.

The Internal Affairs division, headed by the Chattanooga Police Department ("CPD") Captain, conducted an investigation.  Based on the resulting investigative report, the Captain ruled that the shooting was justified.   At the time of the report, the plaintiffs had declined to give the Captain their statement.  So, the Captain based her decision on her review of the investigative report.  She concluded that the officer fired his weapon because he perceived the husband to be an immediate threat to his wife.  Plaintiffs brought suit solely against the City of Chattanooga under a municipal liability theory.  They alleged that the City of Chattanooga had an unwritten policy, practice or custom of condoning the use of excessive force against potential suspects.  The district court granted the City's motion for summary judgment.  Plaintiffs appealed.  The Sixth Circuit affirmed.

On appeal, the *Thomas* plaintiffs sought to establish the alleged policy by arguing that the CPD's handling of their case was itself proof that there was a municipal policy of failing to discipline officers who used excessive force against suspects.  Per plaintiffs,

26

the CPD found the shooting justified despite the fact that, according to plaintiffs, the officer fired his weapon in violation of CPD policy.  Regardless of whether the CPD properly deemed the shooting justified, the *Thomas* Court said that plaintiffs had to establish not only that the investigation was inadequate, but also the elements of what the Court called the "inaction theory," set forth in *Doe v Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996):

> (1) the existence of a clear and persistent pattern of [illegal activity];
>
> (2) notice or constructive notice on the part of the [defendant];
>
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

398 F.3d at 429, 433.  To establish a pattern, the Court said that plaintiffs were required to present evidence beyond the facts of the case showing several separate instances of the alleged rights violation.  *Id* at 433-434.  And, the Court said that plaintiffs could not rely upon a single instance to infer a policy of deliberate indifference.  "'Deliberate indifference' . . . does not mean a collection of sloppy or even reckless, oversights; it means evidence showing an obvious, deliberate indifference" to the alleged violation.  *Doe*, 103 F.3d at 508; *Thomas*, 398 F.3d at 433.  The *Thomas* Court affirmed the district court's grant of summary judgment because plaintiffs failed to present evidence of any other incidents.

This Plaintiff's claim likewise fails.  She does not offer proof of other instances in which the Township of Clinton engaged in acts which suggest a policy of failing to

27

adequately investigate or discipline officers who have used excessive force.  Plaintiff cites *Haugen v Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003),[6] for the proposition that a "[a] single decision by a municipal policymaker 'may be sufficient to trigger section 1983 liability under *Monell*'" when the plaintiff can show that "the triggering decision was the product of a 'conscious, affirmative choice' to ratify the conduct in question."  However, the *Haugen* Court found that the plaintiff failed to make this showing because the plaintiff relied solely on the City and its police department's failure in the single instance at issue to discipline an officer whose use of deadly force was ultimately deemed to be excessive.  Therefore, *Haugen* also makes it clear that the CTPD's allegedly inadequate response to the shooting in this case is alone insufficient to establish municipal liability. The Township of Clinton's motion for summary judgment is granted.

**V.     CONCLUSION**

For the reasons stated, Defendants' motion is **GRANTED IN PART and DENIED IN PART**:

A.     Summary Judgment on Count I (violation of 42 U.S.C. §1983) is

   **GRANTED** against all Defendants except Ernst, Randall, Burgess and

   Graleski.

B.     Summary Judgment on Count II (conspiracy under 42 U.S.C. §1983) is

   **GRANTED** against all Defendants.

C.     Summary Judgment on Count V (gross negligence) is **GRANTED** against

---

[6]Plaintiff actually cited a version of the *Haugen* opinion that was replaced with a later amended opinion at 351 F.3d 372.  *See Haugen v Brosseau*, 339 F.3d 857 (9th Cir. 2003).  The language Plaintiff relies upon was unchanged in the amended opinion.

Defendants Krutell, Terry, Bowles and Vandenheede.  It is **DENIED**

against Defendants Randall, Burgess and Graleski.

Trial will proceed as follows:

A.      Count I §1983 claim against Ernst for failure to investigate;

B.      Count I excessive force §1983 claim against Randall, Burgess and

Graleski;

C.      Count III supervisory liability for failure to train claim against Ernst, Franey,

Waldoch, Terzo, Rybinski, Friese and Penick (no motion made on this

Count);

D.      Count V gross negligence claim against Randall, Burgess and Graleski.

**IT IS SO ORDERED.**


                                        s/Victoria A. Roberts
                                        Victoria A. Roberts
                                        United States District Judge

Dated:  March 30, 2006

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 30, 2006.<br><br>s/Linda Vertriest<br>Deputy Clerk |

29